**NOTICE:   SLIP OPINION**
**(not the court's final written decision)**

The opinion that begins on the next page is a slip opinion.  Slip opinions are the written opinions that are originally filed by the court.

A slip opinion is not necessarily the court's final written decision.  Slip opinions can be changed by subsequent court orders.  For example, a court may issue an order making substantive changes to a slip opinion or publishing for precedential purposes a previously "unpublished" opinion.  Additionally, nonsubstantive edits (for style, grammar, citation, format, punctuation, etc.) are made before the opinions that have precedential value are published in the official reports of court decisions: the Washington Reports 2d and the Washington Appellate Reports.  An opinion in the official reports replaces the slip opinion as the official opinion of the court.

**The slip opinion that begins on the next page is for a published opinion, and it has since been revised for publication in the printed official reports.**  The official text of the court's opinion is found in the advance sheets and the bound volumes of the official reports.  Also, an electronic version (intended to mirror the language found in the official reports) of the revised opinion can be found, free of charge, at this website: https://www.lexisnexis.com/clients/wareports.

For more information about precedential (published) opinions, nonprecedential (unpublished) opinions, slip opinions, and the official reports, see https://www.courts.wa.gov/opinions and the information that is linked there.

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

FILE

IN CLERK'S OFFICE
SUPREME COURT, STATE OF WASHINGTON
JULY 21, 2022

*González C.J.*
CHIEF JUSTICE

THIS OPINION WAS FILED
FOR RECORD AT 8 A.M. ON
JULY 21, 2022

ERIN L. LENNON
SUPREME COURT CLERK

## IN THE SUPREME COURT OF THE STATE OF WASHINGTON

| | | |
|---|---|---|
| In re Dependency of | ) | |
| | ) | No. 99481-1 |
| | ) | |
| | ) | |
| J.M.W., | ) | |
| | ) | |
| | ) | |
| A minor child. | ) | En Banc |
| | ) | |
| | ) | |
| | ) | |
| | ) | Filed: July 21, 2022 |

GONZÁLEZ, C.J.—Separating a child from their family, even for an hour, can cause great trauma. Sometimes, separation is necessary to protect a child who has no parent, guardian, or custodian capable of caring for them. Historically, however, Native children were separated from their families not because of any danger to them but, instead, in an effort by the government to destroy Native tribes and nations. *See In re Dependency of Z.J.G.*, 196 Wn.2d 152, 157, 471 P.3d 853 (2020). To end the widespread abusive practice of removing Native children from their families and destroying Native communities, Congress and the Washington State Legislature passed the Indian Child Welfare Act (ICWA) and the Washington Indian Child

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

*In re Dependency of J.M.W.*, No. 99481-1

Welfare Act (WICWA). *In re Dependency of G.J.A.*, 197 Wn.2d 868, 875, 489 P.3d 631 (2021) (citing 25 U.S.C. §§ 1901-1963; ch. 13.38 RCW). Among other things, under these acts, the State must provide "'active efforts' to prevent the breakup of Indian families." *Id.* (quoting 25 U.S.C. § 1912(d); RCW 13.38.130).

We took discretionary interlocutory review of this case primarily to decide whether WICWA required the State to take active efforts to prevent the breakup of J.M.W.'s family before taking him into emergency foster care. Consistent with the plain text and purpose of WICWA, we conclude that it did. We also conclude that the trial court was required to make a finding on the record at the interim shelter care hearing that J.M.W.'s out of home placement was necessary to prevent imminent physical damage or harm. We remand to the trial court for further proceedings consistent with this opinion.

FACTS

All parties agree that J.M.W. is an Indian[1] child protected by WICWA. J.M.W. and his father are members of the Oglala Sioux Tribe in Pine Ridge, South Dakota. From the time J.M.W. was very young, the State received many reports, most deemed unfounded, that suggested he was being neglected or abused.

On August 14, 2019, when J.M.W. was eight years old, the Department of Children, Youth, and Families received a report that his mother, H.W., was physically

---

[1] We use the term "Indian" when referring to the statutory language that uses the term and use the term "Native" otherwise. Nothing in the record or argument suggests that the department did not know J.M.W. was an Indian child at all critical stages of this case.

2

abusing him.  The person who called the department had a video recording that showed H.W. slapping and yelling at J.M.W. while he cried.  The recording was brief and ended when the person recording it intervened to protect J.M.W.  The department also received pictures of H.W.'s home littered with debris and needles.

After watching the video, a department social worker arranged an interview with H.W.  The interview took place at H.W.'s home.  H.W. admitted she had hit her son. The social worker and H.W. discussed the appropriate use of force and what the State could do to help their family with parenting services and other resources.  When the social worker saw that J.M.W. was sleeping on a mattress on the floor with no frame or bedsheets, she offered to buy both.  She also arranged to give H.W. vouchers for clothing, food, and cleaning supplies.  J.M.W. himself did not want to talk to the social worker on that day.  By this time, the department had learned that J.M.W. and H.W. were not currently living with P.W, H.W.'s husband and J.M.W.'s father.  It also had learned there was a history of domestic violence between the parents.

Two weeks later the social worker went to J.M.W.'s day care to attempt, again, to interview him.  J.M.W. was not at day care that day, and H.W.'s number had been disconnected.  At that point, and apparently for the first time, the social worker attempted, unsuccessfully, to call P.W.  If there were additional efforts to reach him around that time, those efforts are not reflected in the record.

About six weeks after the social worker originally watched the video of H.W. striking her son, his day care reported that he had arrived in pain and with bruises on

3

*In re Dependency of J.M.W.*, No. 99481-1

his face and torso. J.M.W. refused to say how he had been hurt, but nothing observed at day care or on the day care security cameras suggested it happened there. Coincidentally, that same day, the social worker called H.W. to connect her with parenting services. During that conversation H.W. claimed that J.M.W. came home from day care bruised.

The social worker went to the day care to speak with J.M.W., this time accompanied by a law enforcement officer. J.M.W. admitted his mother often broke things and got aggravated but insisted the bruises on his face were left by another child. He refused to let the social worker see the bruises under his clothes. That day, J.M.W. was taken away from his family and into protective custody. Nothing in the record suggests that during that time, the department spoke with P.W. to determine whether he was able to care for his son or took any efforts, let alone active efforts, to help P.W. put himself in a position where he could care for J.M.W.[2]

The next day, the social worker did speak with P.W. P.W. said he would like to have his son placed with him. The record suggests P.W. saw his son regularly and knew H.W. was abusive. The social worker learned P.W. was on supervision by the Department of Corrections, had a history of substance abuse with a likely recent relapse, had repeatedly violated a protective order, and did not have stable housing. Plainly, without active efforts to provide appropriate services from the department,

---

[2] The social worker may have believed that taking active efforts to help P.W. take care of his son would have been futile. Since that time, we have made clear that the futility doctrine does not apply to cases governed by WICWA. *Dependency of G.J.A.*, 197 Wn.2d at 906.

P.W. would not have been able to provide his son with a suitable place to live. Nothing in the record suggests the social worker took any efforts, let alone active efforts, to help P.W. put himself in a position where he could care for his son at that time.

Two days after J.M.W. was taken into protective custody, the department filed a dependency petition. The next day, the court held an emergency shelter care hearing. At that hearing, P.W. unsuccessfully asked to have his son placed with him. P.W. also argued the State had failed to make active efforts, as required by WICWA and ICWA, to prevent his son from being put into foster care. The trial court found that reasonable efforts had been made, but its order is silent as to active efforts. J.M.W. was placed with a family member, and the court ordered services and treatment for both parents.

After the first shelter care hearing, a social worker met with both H.W. and P.W. separately and offered some services. The department knew that P.W. did not have adequate housing, but none of the services offered to P.W. would have remedied that condition.

At the second shelter care hearing, P.W. again argued that the State was required to use active efforts to keep J.M.W. with his parents. The court disagreed, concluding that only reasonable efforts were required, but also found that the department had in fact provided active efforts. The court based its findings on the social worker's efforts between August 14th and September 24th. During that time,

5

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

no meaningful efforts had been made to help P.W. put himself in a position where he could care for his child. The court also found "there ha[d] been no change in circumstances since the shelter care hearing on September 27, 2019." 1 Sealed Clerk's Papers at 3. The court did not make a finding there was an imminent risk of physical harm on the record.

While this case was on review, J.M.W. was returned to his mother, likely mooting the case. Sealed Resp't's Second App. at 27. We nonetheless granted P.W.'s motion for discretionary interlocutory review because, due to the nature of the initial shelter care hearings, issues regarding the proper legal standards that apply can easily evade review. The Native American Law Center, King County Department of Public Defense, the Center for Indian Law and Policy, Northwest Justice Project, American Civil Liberties Union of Washington, Legal Counsel for Youth and Children, and Washington Defender Association (Amici Curiae Native American Law Center) and the Central Council of Tlingit and Haida Indian Tribes of Alaska have submitted amici briefs arguing that active efforts are required.

ANALYSIS

ICWA was enacted "to end the wholesale removal of Indian children from their families by state and private agencies." *Dependency of Z.J.G.*, 196 Wn.2d at 164 (citing *Miss. Band of Choctaw Indians v. Holyfield*, 490 U.S. 30, 32, 109 S. Ct. 1597, 104 L. Ed. 2d 29 (1989)). Our legislature has since built on ICWA and committed the state "to . . . promoting practices designed to prevent out-of-home placement of Indian

*In re Dependency of J.M.W.*, No. 99481-1

children that is inconsistent with the rights of the parents, [and] the health, safety, or welfare of the children." RCW 13.38.030. While the two acts work largely in tandem, when they differ, whichever "law provides a higher standard of protection to the rights of the parent or Indian custodian of an Indian child . . . shall apply." 25 U.S.C. § 1921.

We took this case to decide two questions. First, whether the department is required to make active efforts to keep an Indian child with their family under such circumstances as presented here. Second, whether the trial court was required to make a formal finding at the interim shelter care hearing that continued placement out of the home was necessary to prevent imminent physical damage or harm to the child. These are both questions of law we review de novo. *See Dependency of Z.J.G.*, 196 Wn.2d at 163 (citing *Columbia Riverkeeper v. Port of Vancouver USA*, 188 Wn.2d 80, 90, 392 P.3d 1025 (2017)). In determining what the law means, we consider all the legislature has said that bears on its intent. *Id.* (quoting *Jametsky v. Olsen*, 179 Wn.2d 756, 762, 317 P.3d 1003 (2014)). We review a trial court's finding of active efforts for substantial evidence. *Dependency of G.J.A.*, 197 Wn.2d at 887-88 (quoting *In re Dependency of A.L.K.*, 196 Wn.2d 686, 697, 478 P.3d 63 (2020)). Given that we can

7

resolve these legal questions in P.W.'s favor under WICWA, we do not reach whether

ICWA would provide less protection.

ACTIVE EFFORTS

Both ICWA and WICWA require the department to use "'active efforts' to

prevent the breakup of the Indian family." *Id.* at 873 (quoting 25 U.S.C. § 1912(d)).

Trial courts presiding over hearings involving children protected by WICWA are

required to evaluate whether active efforts have been taken "at every hearing when the

Indian child is placed out of the home." *Id.* at 875 (citing RCW 13.38.040(1)(a)(ii)).

*Dependency of G.J.A.* itself concerned hearings that were held long after the

dependencies had been established and as the department was seeking to terminate the

mother's parental rights. *Id.* at 877-78. The case before us today largely concerns

two shelter care hearings that happened shortly after J.M.W. was placed into foster

care. "Shelter care hearings" are hearings where a judge determines whether a child

who has been taken into protective custody can be safely returned to their parents.

*See* RCW 13.34.050, .065(1); RCW 13.38.140.

Both shelter care hearings were done in the context of a dependency

proceeding. Both shelter care hearings were child custody proceedings under RCW

13.38.040(3) and foster care placements under RCW 13.38.040(1)(a) and .040(3)(a).

"Child custody proceedings" include foster care placements. RCW 13.38.040(3)(a).

"'Foster care placement' . . . means any action removing an Indian child from his or

her parent . . . for temporary placement . . . where the parent or Indian custodian

cannot have the child returned upon demand." RCW 13.38.040(3)(a).

> Most relevantly, under WICWA, "active efforts" means

> [i]n any foster care placement or termination of parental rights proceeding of an Indian child under chapter 13.34 RCW . . . the department or supervising agency shall make timely and diligent efforts to provide or procure such services, including engaging the parent or parents or Indian custodian in reasonably available and culturally appropriate preventive, remedial, or rehabilitative services. This shall include those services offered by tribes and Indian organizations whenever possible. At a minimum "active efforts" shall include:

> (i) In any dependency proceeding under chapter 13.34 RCW seeking out-of-home placement of an Indian child in which the department or supervising agency provided voluntary services to the parent, parents, or Indian custodian prior to filing the dependency petition, a showing to the court that the department or supervising agency social workers actively worked with the parent, parents, or Indian custodian to engage them in remedial services and rehabilitation programs to prevent the breakup of the family beyond simply providing referrals to such services.

> (ii) In any dependency proceeding under chapter 13.34 RCW, in which the petitioner is seeking the continued out-of-home placement of an Indian child, the department or supervising agency must show to the court that it has actively worked with the parent, parents, or Indian custodian in accordance with existing court orders and the individual service plan to engage them in remedial services and rehabilitative programs to prevent the breakup of the family beyond simply providing referrals to such services.

RCW 13.38.040(1)(a).

The department argues that it is not required to establish active efforts at the

shelter care hearings because the definition above states that "[i]n any foster care

placement . . . the department or supervising agency shall make *timely and diligent*

*efforts* to provide or procure such services." *Id*. (emphasis added). It contends that timely and diligent efforts are less than active efforts.

We recognize that WICWA's lengthy definition of and requirements for "active efforts" in the context of foster care placements are not models of clarity. But read as a whole, we conclude that active efforts are required in involuntary foster care placements under WICWA.[3] RCW 13.38.040(1)(a) says that "[a]t a minimum," the department is required to take timely and diligent efforts as part of its active efforts. Other portions of WICWA make clear that active efforts are required when possible. RCW 13.38.130, for example, says that "[a] party seeking to effect an involuntary foster care placement of . . . an Indian child shall satisfy the court that *active efforts* have been made to . . . prevent the breakup of the Indian family and that these efforts have proved unsuccessful." (Emphasis added.) The department was presumptively obligated to establish it had provided active efforts to J.M.W.'s family before removing him from his home and initiating a dependency. These active efforts include timely and diligent efforts.

We recognize, however, that law enforcement and the department may be called on to take children into protective custody under emergency circumstances where prior active efforts are not possible or required by WICWA. WICWA

---

[3] Our dissenting colleagues are correct that under federal regulations, the department was not required to take active efforts before removing J.M.W. from his mother's home. But Washington has not adopted those regulations, and our own law provides stronger protections for families. At least in the absence of state regulations, we interpret WICWA in light of its overriding legislative purpose: to avoid the breakup of Native families.

mandates that "nothing shall be construed to prevent the department or law enforcement from the emergency removal of an Indian child . . . to prevent imminent physical damage or harm to the child." RCW 13.38.140(1).[4]  Prior active efforts may not be required at least in some instances when, for example, a court orders law enforcement or Child Protective Services to take a child into custody in an emergency. RCW 13.34.050.  Children must or may be taken into protective custody in certain other emergency situations even without a court order.  *See* RCW 13.34.055 (custodial interference); RCW 26.44.050 ("law enforcement officer may take . . . a child into custody without a court order if there is probable cause to believe that the child is abused or neglected"), .056 (authorizing certain medical professionals to take a child into custody when there is "reasonable cause" that continuing the current placement "would present an imminent danger to that child's safety").  In such circumstances, the department's active efforts obligation may not be triggered until after the first shelter care hearing.  But as the department itself rightly acknowledges, it has an obligation to begin active efforts as soon as possible.  Resp't's Br. at 49. Where, as here, the department had prior contact with the family and reason to believe the child was at risk of physical damage or harm, it had an obligation to at least begin

---

[4] The department suggests that holding active efforts are required at shelter care hearings will necessarily require the department to comply with impossible requirements, such as 10 days' prior written notice to various stakeholders.  Such a requirement would be inconsistent with RCW 13.38.140(1).  Read as a whole, WICWA does not require that notice when it could not be accomplished.

11

*In re Dependency of J.M.W.*, No. 99481-1

active efforts to avoid breaking up the family. The trial court had an obligation to

consider whether active efforts had been taken at these shelter care hearings.[5]

As we recently summarized the relevant law:

> Under ICWA, the court is required to evaluate the Department's provision of active efforts at foster care placement hearings and termination hearings. 25 U.S.C. § 1912(d). The B[ureau of] I[ndian] A[ffairs] (BIA) recommends the court "inquire about active efforts *at every court hearing* and *actively* monitor compliance with the active efforts requirement." BIA[ U.S. DEP'T OF INTERIOR], GUIDELINES [FOR IMPLEMENTING THE INDIAN CHILD WELFARE ACT] at 43 [(2016)] (emphasis added). Under WICWA, the court is required to make this finding when the child is first placed out of the home, at termination, and "[i]n any dependency proceeding . . . in which the [State] is seeking the continued out-of-home placement of an Indian child." RCW 13.38.040(1)(a)(i)-(iii); *see also* 13.38.130(1). We apply the provision that offers greater protections to Indian families. 25 U.S.C. § 1921; [*Matter of Adoption of*] *T.A.W.*, 186 Wn.2d [828,] at 844[, 383 P.3d 492 (2016)]. Therefore, the Department bears the burden to demonstrate active efforts and the dependency court has the responsibility to evaluate those efforts at every dependency proceeding where the child is placed out of the home. RCW 13.38.040(1)(a)(ii). If the Department's actions are not sufficient, the court must direct the Department to do more before the case may proceed to termination.

*Dependency of G.J.A.*, 197 Wn.2d at 907-08 (some alterations in original). We hold

that the obligation applied to both the initial and interim shelter care hearings in this

case. Since the department had not established it had made active efforts, J.M.W.

should have been returned to his parents unless the department had established doing

so would have subjected him "to substantial and immediate danger or threat of such

---

[5] We respectfully disagree with our dissenting colleagues that proof of active efforts will be required at all shelter care hearings. But when the department has reason to know a Native child is at risk of needing to be removed from their home for their own safety, it has an obligation to at least begin to take efforts to avoid removing the child from their family's care.

*In re Dependency of J.M.W.*, No. 99481-1

danger." RCW 13.38.160. While this is similar to findings the trial court made, it is not the finding the trial court made. Active efforts were required.[6] The trial court erred in the first shelter care hearing by not requiring the department to show active efforts had been made.

FINDINGS

Under WICWA, a child who has been removed from their home must be immediately returned when "removal or placement is no longer necessary to prevent imminent physical damage or harm to the child." RCW 13.38.140(2). The trial court made this finding at the initial shelter care hearing. The trial court did not make this finding at the interim shelter care hearing but, instead, concluded that "there ha[d] been no change in circumstances since the shelter care hearing on September 27, 2019." 1 Sealed Clerk's Papers at 3. This was error. Under RCW 13.38.140(2), the finding was required.

CONCLUSION

J.M.W. has been returned to his mother. Accordingly, there is no relief that this court can offer. However, we take this opportunity to emphasize that WICWA requires more of the department and the trial court than occurred here. In such circumstances, the department must establish that it took active efforts to prevent the

---

[6] We recognize that the Court of Appeals reached a different conclusion based largely on ICWA. *In re Dependency of Z.J.G.*, 10 Wn. App. 2d 446, 472, 448 P.3d 175 (2019), rev'd, 196 Wn.2d 152. To the extent the Court of Appeals' decision in *Z.J.G.* is inconsistent with our interpretation of WICWA, it is overruled.

13

*In re Dependency of J.M.W.*, No. 99481-1

breakup of the family before taking J.M.W. into shelter care and subsequently keeping him in shelter care. The proceedings below did not comply with WICWA. We remand to the trial court for any further proceedings necessary consistent with this opinion.

González, C.J.
_____
González, C.J.

WE CONCUR:

Gordon McCloud, J.
_____
Gordon McCloud, J.

_____
Yu, J.

Montoya-Lewis, J.
_____
Montoya-Lewis, J.

Whitener, J.
_____
Whitener, J.

14

*In re Dependency of J.M.W.*, No. 99481-1
(Stephens, J., dissenting)

No. 99481-1

STEPHENS, J. (dissenting)—Both the Indian Child Welfare Act (ICWA)[1]

and the Washington State Indian Child Welfare Act (WICWA)[2] were enacted to end

the historical governmental policy of removing Native children from their families

without due process. 25 U.S.C. § 1902; RCW 13.38.030; *In re Dependency of*

*Z.J.G.*, 196 Wn.2d 152, 165-66, 471 P.3d 853 (2020). To effectuate this purpose,

ICWA and WICWA set out the procedural requirement that child welfare agencies

make culturally appropriate "active efforts" "to prevent the breakup of the Indian

family"[3] in specified child custody proceedings. 25 U.S.C. § 1912(d); RCW

13.38.130(1). Importantly, the procedures set out in the federal and state statutes

align in this regard.

I would not read the provisions that mandate "active efforts" to extend to

*emergency proceedings* under ICWA or WICWA, where the removal of an Indian

child rests specifically on the need to "prevent imminent physical damage or harm

---

[1] 25 U.S.C. §§ 1901-1963.

[2] Ch. 13.38 RCW.

[3] Like the majority, this opinion will use the term "Indian family" or "Indian child" as used in the statutory language of ICWA and WICWA. The term "Native" will be used otherwise.

1

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

to the child." 25 U.S.C. § 1922; RCW 13.38.140(1). Such emergency removals are expressly limited by statute and require the Department of Children, Youth, and Families (Department) to protect a child's safety in the short term with the ultimate goal of reunifying that child with their family if possible.

By concluding that WICWA deviates from ICWA and required proof of the Department's active efforts at J.M.W.'s shelter care hearing, today's majority unjustifiably rewrites the specific state statutes governing emergency proceedings. In so doing, the majority drives a wedge between ICWA and WICWA that undermines, rather than advances, the overall statutory purpose. There is no dispute that active efforts are an essential part of Native child welfare proceedings, but ICWA's implementing regulations and other guidance do not require a court to make a finding of active efforts as a prerequisite to an emergency removal.

Based on ICWA's interpretive guidance, active efforts need not be proved prior to an emergency removal. At the same time, ICWA emphasizes that active efforts should be monitored throughout the emergency proceedings and that child-custody proceedings—with the full gamut of ICWA's protections, including proof of active efforts—should be initiated as soon as possible. The majority fails to identify any basis for why WICWA—which includes identical guidance for emergency removal—should be interpreted any differently. I agree that active efforts should be monitored from the time a Native child is taken from their family

2

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

*In re Dependency of J.M.W.*, No. 99481-1
(Stephens, J., dissenting)

to ensure the Department is providing culturally appropriate services to actively facilitate the reunification of Native families. But because I would conclude that active efforts are not a *prerequisite* to the emergency removal of an Indian child from their home but instead an ongoing obligation of the Department following emergency removal, I respectfully dissent.

ANALYSIS

We have recognized "active efforts" as part of the "heightened standards" provided to Native families and as "one of the most important protections under ICWA and WICWA." *In re Dependency of G.J.A.*, 197 Wn.2d 868, 888, 489 P.3d 631 (2021). Active efforts are considered the "'gold standard'" in child welfare proceedings, requiring the State to provide a more robust level of services to rectify barriers to a parent's ability to adequately care for their child. BUREAU OF INDIAN AFFAIRS, U.S. DEP'T OF INTERIOR, GUIDELINES FOR IMPLEMENTING THE INDIAN CHILD WELFARE ACT 39 (BIA GUIDELINES). The importance of the Department's duty to provide active efforts under ICWA and WICWA is not questioned in this case. Instead, the discrete question presented is whether the court at a shelter care hearing must make a finding that the Department engaged in active efforts prior to an emergency removal—or else immediately return the child home. Because we are considering whether active efforts are a *prerequisite* to emergency removal of a Native child whose safety is imminently threatened, we must closely examine

3

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

ICWA's and WICWA's treatment of emergency proceedings—the earliest possible proceedings in a dependency case.

I.    Emergency Proceedings under ICWA and WICWA

ICWA and WICWA both provide that an Indian child may be removed on an emergency basis to "prevent imminent physical damage or harm to the child." 25 U.S.C. § 1922; RCW 13.38.140(1). At the same time, ICWA and WICWA require that emergency removal must end as soon as possible when it is no longer necessary to prevent imminent physical harm to the child. 25 U.S.C. § 1922; 25 C.F.R. § 23.113(a); RCW 13.38.140(2). ICWA and WICWA are substantially identical in the requirement that the State "expeditiously initiate a child custody proceeding subject to the provisions of this subchapter, transfer the child to the jurisdiction of the appropriate Indian tribe, or restore the child to the parent or Indian custodian, as may be appropriate." 25 U.S.C. § 1922; *see also* RCW 13.38.140(2). Under ICWA's regulations, any of those three actions results in the termination of the emergency proceeding. 25 C.F.R. § 23.113(c).

Both ICWA and WICWA differentiate between emergency proceedings and child custody proceedings—an important distinction because shelter care hearings are Washington's version of emergency proceedings. As occurred in J.M.W.'s case, a child may be placed in shelter care when they are taken into protective custody for alleged abuse or neglect without a court order. RCW 13.34.060(1) (citing RCW

4

*In re Dependency of J.M.W.*, No. 99481-1
(Stephens, J., dissenting)

26.44.050). A shelter care hearing must occur within 72 hours of removal, and "[t]he primary purpose of the shelter care hearing is to determine whether the child can be immediately and safely returned home while the adjudication of the dependency is pending." RCW 13.34.065(1)(a). The shelter care statute states that the child must be returned home unless the court finds the following:

> (i) After consideration of the specific services that have been provided, *reasonable efforts* have been made to prevent or eliminate the need for removal of the child from the child's home and to make it possible for the child to return home; and
> (ii)(A) The child has no parent, guardian, or legal custodian to provide supervision and care for such child; or
> (B) The release of such child would present a serious threat of substantial harm to such child, notwithstanding an order entered pursuant to RCW 26.44.063; or
> (C) The parent, guardian, or custodian to whom the child could be released has been charged with violating RCW 9A.40.060 or 9A.40.070.

RCW 13.34.065(5)(a) (emphasis added).

These requirements at a shelter care hearing apply regardless of whether a child is an Indian child under ICWA and WICWA. If there is reason to know that the child is an Indian child, the removal standard differs. Rather than emergency removal being allowed if the child's home would pose "a serious threat of substantial harm" to the child, RCW 13.34.065(5)(a)(ii)(B), ICWA and WICWA require proof that removal was necessary to "prevent imminent physical damage or harm to the child." 25 U.S.C. § 1922; RCW 13.38.140(1). The majority concludes there is

5

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

another, implied difference: the requirement to find "reasonable efforts" in subsection .065(5)(a)(i) must be read to require "active efforts" when the child is an Indian child subject to ICWA and WICWA. But because neither ICWA nor WICWA support this rewriting of the shelter care statute—and in fact, point to the opposite conclusion—proof of active efforts is not a prerequisite to emergency removal that must be found at a shelter care hearing. The statute must be applied according to its plain terms, as the trial court recognized.

II. The Majority's Reading of the Shelter Care Statute Fails To Give Effect to ICWA's and WICWA's Specific Guidance for Emergency Removals

The majority concludes that this case is controlled by its interpretation of WICWA's active efforts provisions, stating "[W]e do not reach whether ICWA would provide less protection." Majority at 8. With regard to state versions of ICWA, the federal law generally allows states to "clarify ICWA or add protections to child custody proceedings involving Indian children." *Z.J.G.*, 196 Wn.2d at 171 (citing 25 U.S.C. § 1921). We have recognized that "WICWA is meant to strengthen Washington's enforcement of the fundamental protections that ICWA guarantees to an Indian child, their parents, and their tribe(s)." *Id.* What this means is that ICWA and WICWA "should be read as *coextensive* barring specific differences in their statutory language." *In re Adoption of T.A.W.*, 186 Wn.2d 828, 844, 383 P.3d 492 (2016) (emphasis added).

6

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

*In re Dependency of J.M.W.*, No. 99481-1
(Stephens, J., dissenting)

ICWA and WICWA contain parallel provisions for emergency proceedings, recognizing that nothing in ICWA or WICWA should be interpreted to foreclose emergency removal to "prevent imminent physical damage or harm to the child." 25 U.S.C. § 1922; RCW 13.38.140(1). Thus, while the majority dismisses ICWA as irrelevant, I view ICWA's discussion of active efforts in emergency proceedings as an important and informative step in properly interpreting WICWA. A closer examination of the relevant statutory language confirms the alignment of ICWA and WICWA in this regard.

### A. ICWA Does Not Require Proof of Active Efforts at Emergency Proceedings

Under ICWA and its implementing regulations and guidance, the State is not required to prove that it engaged in active efforts before an emergency removal, and the court is not required to make such a finding at an emergency hearing. ICWA requires "active efforts" in foster care placement and termination proceedings. 25 U.S.C. § 1912(d) ("Any party seeking to effect a foster care placement of, or termination of parental rights to, an Indian child under State law shall satisfy the court that active efforts have been made."); *see also* 25 C.F.R. § 23.120. Under ICWA and its implementing regulations, foster care placement and termination proceedings are "child custody proceedings" that are distinct from "emergency proceedings."

7

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

*In re Dependency of J.M.W.*, No. 99481-1
(Stephens, J., dissenting)

Most importantly, ICWA regulations explain that active efforts are required only in "child custody proceedings" and not in "emergency proceedings." ICWA's regulations require that "[w]here an agency is involved in the *child-custody proceeding*, active efforts must involve assisting the parent or parents or Indian custodian through the steps of a case plan and with accessing or developing the resources necessary to satisfy the case plan." 25 C.F.R. § 23.2 (emphasis added). While the regulatory definition of "child-custody proceedings" includes foster care placement and termination, it explicitly excludes emergency proceedings: "'Child-custody proceeding' *means and includes any action, other than an emergency proceeding*." 25 C.F.R. § 23.2 (emphasis added). And the regulations contain a table that does not list "emergency proceedings" as a proceeding to which ICWA's active efforts requirement applies. *See* 25 C.F.R. § 23.104.

The comments and responses to the regulations as well as the *BIA Guidelines* remove any doubt from this conclusion. One of the BIA responses states that ICWA "does not explicitly apply the active-efforts requirement to emergency proceedings. For this reason, the final rule does not require active efforts prior to an emergency removal or emergency placement." ICWA Proceedings, 81 Fed. Reg. at 38,814. While the *BIA Guidelines* expressly state that active efforts are not required prior to emergency removal, they recommend that the court "inquire about active efforts at

8

*In re Dependency of J.M.W.*, No. 99481-1
(Stephens, J., dissenting)

every court hearing and actively monitor compliance with the active efforts requirement." BIA GUIDELINES at 43.

The Department points out that every state to consider the issue has concluded that ICWA does not require proof of active efforts prior to emergency removal at an emergency proceeding. Resp't's Br. at 23-24. And this interpretation is consistent with this court's conclusion in *G.J.A.* that ICWA does not require proof of active efforts in a hearing prior to a termination of parental rights. 197 Wn.2d at 910-11. In *G.J.A.*, we considered the applicability of ICWA's active efforts requirement to a proceeding occurring after a court found a child dependent but before a hearing on whether the parent's rights would be terminated. We recognized that ICWA did not require a finding of active efforts at such a hearing. *Id.* at 910 (noting that "[t]he *BIA Guidelines* recommend, but do not require, the active efforts finding be made on the record at every hearing during the dependency under ICWA"). Because *G.J.A.* involved hearings occurring after an emergency proceeding, its reasoning supports the natural conclusion that ICWA also does not require proof of active efforts at earlier stages of the case prior to removal.

The majority disregards this aspect of ICWA in concluding that WICWA requires a finding of active efforts at shelter care hearings. The majority reasons that "Washington has not adopted [ICWA's] regulations, and our own law provides stronger protections for families." Majority at 10 n.3. The majority fails to point

9

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

to any indication that the drafters of WICWA intended the state statute to depart so dramatically from ICWA on this issue. And given how clear ICWA's history and guidance is on the absence of an active efforts requirement for emergency removals, one would expect such a difference to be expressly stated. By reading WICWA to differ from ICWA and to require proof of active efforts prior to emergency removal, the majority undermines the act's important emergency protections and upsets the statutory balance between protecting Native children whose safety is imminently threatened with the Department's duty to prevent the breakup of Native families. The majority concludes that it is interpreting "WICWA in light of its overriding legislative purpose: to avoid the breakup of Native families." *Id*. But that is also the overriding purpose of ICWA. By focusing solely on maximizing that purpose, the majority's analysis leaves no room for WICWA's emergency protections.

> B. The Majority's Conclusion That Shelter Care Hearings are Foster Care Placements Rewrites the Shelter Care Statutes and Erroneously Requires the Department To Prove Active Efforts Prior to *All* Emergency Removals

As noted, ICWA and WICWA generally align. WICWA's statutory language for when active efforts are required is almost identical to ICWA's. It provides that "[a] party seeking to effect an involuntary foster care placement of or the involuntary termination of parental rights to an Indian child shall satisfy the court that active efforts have been made." RCW 13.38.130(1). WICWA's definitional section offers

10

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

further guidance regarding active efforts. The general section defining "active efforts" states that active efforts are required in "any foster care placement or termination of parental rights proceeding of an Indian child under chapter 13.34 RCW and this chapter." RCW 13.38.040(1)(a). In two subsections that the majority points to as relevant to this case, WICWA's definition of "active efforts" further provides that such efforts are required in "any dependency proceeding" when the Department either "provided voluntary services to the parent, parents, or Indian custodian prior to filing the dependency petition," RCW 13.38.040(1)(a)(i), or when the Department "is seeking the continued out-of-home placement of an Indian child." RCW 13.38.040(1)(a)(ii).

The majority recognizes that WICWA's language governing active efforts "[is] not [a] model[ ] of clarity." Majority at 10. Far from clearing up potential confusion, today's opinion creates more ambiguity and offers a strained interpretation of WICWA that fundamentally alters the statutory framework governing shelter care hearings. The majority begins by concluding that "shelter care hearings [are] child custody proceedings under RCW 13.38.040(3) and foster care placements under RCW 13.38.040(1)(a) and .040(3)(a)." *Id.* at 8. It seems that the majority fails to appreciate the impact of this broad conclusion. The plain language of WICWA requires that active efforts be proved at any proceeding resulting in an involuntary foster care placement. *See* RCW 13.38.130(1) (stating

11

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

that in any proceeding seeking "involuntary foster care placement" the Department "shall satisfy the court that active efforts have been made"); *see also* RCW 13.38.040(1)(a). Concluding that shelter care hearings are proceedings leading to involuntary foster care placements means that proof of active efforts is required at all shelter care hearings.

Seemingly recognizing how that interpretation directly conflicts with WICWA's guidance on emergency removals, the majority tries to pull back by noting that "[p]rior active efforts may not be required at least in some instances." Majority at 11. For example, the majority concludes that the Department could remove a child on an emergency basis without proof of active efforts when it suspects that a child is being abused or neglected under RCW 26.44.050.[4] This conclusion is simply inconsistent with the majority's own reasoning. Because the majority concludes that shelter care hearings are proceedings seeking involuntary foster care placement, the Department must show that it provided active efforts at a shelter care hearing regardless of how a child's emergency removal occurred.

The majority also attempts to mitigate the impact of its conclusion that shelter care hearings are involuntary foster care placements by emphasizing that other

---

[4] The majority's specific reference to emergency removal for suspected physical abuse or neglect under RCW 26.44.050 is particularly puzzling given that this appears to be the basis on which J.M.W. was removed from his mother's care in this case.

12

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

WICWA protections are not triggered at those hearings, including a key provision requiring notice to the relevant tribe under RCW 13.38.070(1). This appears to be directly contrary to the plain language of the statute and this court's opinion in *Z.J.G.* Majority at 11 n.4. In *Z.J.G.*, this court did describe a shelter care hearing as an involuntary child custody proceeding under WICWA. 196 Wn.2d at 173 n.13 ("There is no dispute that a shelter care hearing is an involuntary child custody proceeding."). However, we noted this fact simply to state that ICWA and WICWA generally apply to a shelter care hearing when the Department has reason to know that the child is an Indian child. *Id.* at 173-75. While we highlighted that this may trigger certain ICWA and WICWA protections, *such as notice to the relevant tribe*, our decision did not include "active efforts" as one of the applicable protections. *Id.* at 175 (citing 25 U.S.C. § 1912(a); RCW 13.38.070(1)). That *Z.J.G.* did not discuss "active efforts" as an applicable WICWA protection at a shelter care hearing counsels against an expansion in this case.[5]

---

[5] This also calls into question the majority's readiness to overrule the Court of Appeals holding in *Z.J.G.* that active efforts are not required to be shown at a shelter care hearing. Majority at 13 n.6. (citing *In re Dependency of Z.J.G.*, 10 Wn. App. 2d 446, 472, 448 P.3d 175 (2019), *rev'd*, 196 Wn.2d 152). In that case, the Court of Appeals had also concluded that the notice provision, RCW 13.38.070(1), did not apply to a shelter care hearing. *See Z.J.G.*, 10 Wn. App. 2d at 471-73. As noted, our decision in *Z.J.G.* concluded that it does apply to those hearings. Today, the majority apparently returns to the conclusion that formal notice under RCW 13.38.070(1) is not required at shelter care hearings. It remains unclear how the majority's opinion can be harmonized with this court's decision in *Z.J.G.*

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

And because the plain language of the statute requires notice in any proceeding leading to an involuntary foster care placement, the shelter care hearing cannot be "held until at least ten days after receipt of notice by the parent or Indian custodian and the tribe." RCW 13.38.070(1). If such notice requirements extend here, this plainly conflicts with WICWA's more flexible notice for emergency proceedings, which can be given after emergency removal and is not intended to be a substitute for notice under 13.38.070(1). RCW 13.38.140(3) ("When the nature of the emergency allows, the department must notify the child's tribe before the removal has occurred. If prior notification is not possible, the department shall notify the child's tribe by the quickest means possible. . . . This notice shall not constitute the notice required under RCW 13.38.070 for purposes of subsequent dependency, termination of parental rights, or adoption proceedings.").

Perhaps to avoid the consequences of its decision to equate shelter care hearings with involuntary foster care placement hearings, the majority signals a fact-specific holding that proof of active efforts was required in this case under RCW 13.38.040(1)(a)(i) because the Department voluntarily provided services prior to J.M.W.'s emergency removal. *See* majority at 11-12. The WICWA subsection the majority relies on is simply an example of what "active efforts" must include "[a]t a minimum." RCW 13.38.040(1)(a). As highlighted by the Department, this subsection follows from the general section set out at the beginning of the statute,

14

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

and is just one example of those proceedings where active efforts must be proved, specifically for "*any* foster care placement." RCW 13.38.040(1)(a) (emphasis added). The breadth of the majority's holding, and its impact on the entire statutory scheme, is unavoidable: if shelter care hearings are involuntary foster care placement proceedings, then proof of active efforts is always required, not just when the Department voluntarily provides services prior to the filing of the dependency. At bottom, under the plain language of WICWA's provisions, the majority's various attempts to reduce the collateral consequences of its decision are ineffective. The difficulties and internal inconsistencies resulting from the majority's conclusion that active efforts needed to be proved at J.M.W.'s shelter care hearings demonstrates why this reading of WICWA is mistaken.

Finally, the majority relies heavily on this court's decision in *G.J.A.*, where we recognized that under RCW 13.38.040(1)(a)(ii) WICWA requires proof of active efforts at every dependency hearing that results in placement of the child outside of the home or that continues such a placement. 197 Wn.2d at 910-11 ("WICWA *requires* that the dependency court make this finding at every hearing where the Indian child is in out-of-home placement."). The majority's expansive reading of *G.J.A*'s discussion of active efforts at different types of hearings in child welfare proceedings is unwarranted because that case drew a distinction between a termination hearing and a proceeding occurring after a court found a child

15

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

dependent. Because that case did not consider the prerequisites to be proved at a shelter care hearing for emergency removal of a Native child at all, the majority's reliance on *G.J.A.* unjustifiably rewrites the statutes governing shelter care hearings.

One prerequisite to placing a child in shelter care is that the Department must provide "reasonable efforts" to "prevent or eliminate the need for removal of the child from the child's home and to make it possible for the child to return home." RCW 13.34.065(5)(a)(i).[6] In *G.J.A.*, we recognized that "[t]he 'active efforts' requirement is distinct from the 'reasonable efforts' requirement in non-Indian child custody cases because it requires both a higher level of engagement from the Department and culturally appropriate services." 197 Wn.2d at 875. But replacing "reasonable efforts" with the heightened standard of "active efforts" in this context is not justified by any legislative intent and conflicts with the broader structure of WICWA, which echoes ICWA's treatment of emergency proceedings as unique.

---

[6] I agree with the majority that once the Department has reason to know that a child whose safety is imminently threatened is a Native child, "it has an obligation to at least begin to take efforts to avoid removing the child from their family's care." Majority at 12 n.5. But such efforts are already contained within the shelter care statute's "reasonable efforts" requirement, which contemplates efforts to prevent removal. The majority thinks those efforts are sufficient in some cases involving emergency removal of Native children. *See id*. at 11. This supports the conclusion that a *finding* of "active efforts" is not required prior to emergency removal.

*In re Dependency of J.M.W.*, No. 99481-1
(Stephens, J., dissenting)

III.   Consistent with ICWA, We Should Conclude That Active Efforts Are
       Encouraged but Not Required as an Element of Proof Prior to an Emergency
       Removal

WICWA, like ICWA, underscores the importance of making active efforts as early as possible in child welfare proceedings involving a Native child. But like ICWA, WICWA also recognizes the paramount importance of protecting Native children from imminent harm by allowing for emergency removals. To be sure, some of the statutory definitions differ between the state and federal acts. Unlike ICWA's definition of "child custody proceeding," WICWA's definition does not distinguish between emergency proceedings, such as shelter care hearings, and child custody proceedings. *Compare* RCW 13.38.040(3)(a) (stating that "[c]hild custody proceeding" includes "'[f]oster care placement' which means any action removing an Indian child from his or her parent or Indian custodian for temporary placement in a foster home, institution, or with a relative, guardian, conservator, or suitable other person where the parent or Indian custodian cannot have the child returned upon demand, but where parental rights have not been terminated"), *with* 25 C.F.R. § 23.2 ("'[c]hild-custody proceeding' means and includes any action, other than an emergency proceeding"). At the same time, WICWA's provisions governing emergency removal recognize that emergency removal is distinct from other child custody proceedings, such as foster care placement. There is an express requirement that the department "shall ensure that the emergency removal or placement

17

*In re Dependency of J.M.W.*, No. 99481-1
(Stephens, J., dissenting)

terminates immediately when such removal or placement is no longer necessary to prevent imminent physical damage or harm to the child and shall *expeditiously initiate a child custody proceeding* subject to the provisions of the federal Indian child welfare act and this chapter." RCW 13.38.140(2) (emphasis added).

Though WICWA does not precisely track ICWA's definitional structure by listing "emergency proceedings" as separate from "child custody proceedings," it also does not express any disagreement with ICWA's approach to emergency proceedings or expressly state that proof of active efforts is a precondition to emergency removal. The majority reads WICWA to significantly depart from ICWA in this regard, but one would expect to see more explicit language announcing a departure on this important issue. And the majority points to none.

In fact, the statutory guidance we do have in WICWA underscores the same concerns about emergency removal and points to not strictly requiring active efforts prior to removal. Both ICWA and WICWA provide that nothing in the statutory framework should be interpreted to prevent removal when imminent physical harm to the child exists. 25 U.S.C. § 1922; RCW 13.38.140(1). The statutory scheme involving shelter care hearings also demonstrates that a child's safety is central to these emergency proceedings. RCW 13.34.065(4) ("The paramount consideration for the court shall be the health, welfare, and safety of the child."). The whole

18

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

purpose of the emergency removal is to keep a child safe on a short-term basis while the dependency proceedings continue. RCW 13.34.065(1)(a).

Rather than reading into WICWA a strict requirement that deviates from ICWA, I would recognize that the state statute, like ICWA, does not require proof of active efforts prior to an emergency removal. While WICWA encourages the monitoring of active efforts at the earliest possible phase of proceedings, imposing a proof requirement at a shelter care hearing runs contrary to the essential purpose of protecting Native children from imminent harm and creates a proof requirement for which there is no appropriate remedy. The majority concludes that the same remedy applies at a shelter care hearing as at later proceedings, i.e., the child must be returned to a parent unless the child is subject "to a substantial and immediate danger or threat of such danger." 25 U.S.C. § 1920; RCW 13.38.160. But under this reading, the need for emergency removal still outweighs the need to provide active efforts, suggesting either that the requirement is an empty promise or—more likely—that the statute does not contemplate proof of active efforts prior to an emergency removal.

The Department acknowledges that it should provide active efforts as soon as possible—including at the time of an emergency proceeding—consistent with the overall goal to promote the reunification of Native families. Resp't's Br. at 49-50. In fact, the trial courts below emphasized the importance of active efforts at both the

*In re Dependency of J.M.W.*, No. 99481-1
(Stephens, J., dissenting)

first and second shelter care hearings. The court at the first shelter care hearing set a second hearing to consider whether active efforts were made prior to removal. While rejecting the argument that a judicial finding of active efforts was required at a shelter care hearing, the court at the second shelter care hearing nonetheless monitored the Department's active efforts. I believe this was the proper approach under WICWA, consistent with ICWA and the view of every other state to have considered this issue.

I understand the majority's concern that the Department's efforts in this case with regard to J.M.W.'s father, P.W., were not exemplary. But recognizing that more should have been done does not alter the existing statutory framework under both ICWA and WICWA, which does not require proof of active efforts prior to an emergency removal. I would reject the notion that WICWA alone mandates proof of active efforts at a shelter care hearing. In the absence of any explicit statutory language or indication of legislative intent to so drastically depart from ICWA, I would read WICWA to similarly encourage active efforts but not require a judicial finding prior to an emergency removal.

IV.    Neither ICWA nor WICWA Requires a Finding of Imminent Harm on the Record

Last, the majority also concludes that the trial court in this case erred by failing to make a finding of imminent harm on the record at the second hearing, despite the

20

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

fact that it made that express finding at the first hearing. The majority concludes that WICWA required a finding on the record at the second shelter care hearing that emergency removal was "'necessary to prevent imminent physical damage or harm to the child.'" Majority at 13 (quoting RCW 13.38.140(2)). While it is true that a child must be returned to their family when they are no longer in danger of imminent harm under both ICWA and WICWA, WICWA itself does not require that an imminent harm finding be made on the record. *See* RCW 13.38.140(2). As noted in P.W.'s briefing, it is the *ICWA* regulations that require a finding of imminent physical harm to be stated on the record at the initial emergency hearing. 25 C.F.R. § 23.113(b)(1) (requiring that the court "[m]ake a finding on the record that the emergency removal or placement is necessary to prevent imminent physical damage or harm to the child"); *see* Pet'r's Opening Br. at 25-26 (citing only ICWA's regulations for the requirement that an imminent harm finding be made on the record). The ICWA regulations require such finding only at the initial hearing. There is no requirement that the court make an explicit finding on the record at a subsequent proceeding, though it still must be clear from the record that the court found that there was an imminent threat of physical harm. 25 C.F.R. § 23.113(b)(3) ("At any court hearing during the emergency proceeding, determine whether the emergency removal or placement is no longer necessary to prevent imminent physical damage or harm to the child.").

21

*In re Dependency of J.M.W.*, No. 99481-1
(Stephens, J., dissenting)

That is what happened in this case. At the initial shelter care hearing, the trial court made a finding on the record that an imminent threat of physical damage or harm existed that justified a shelter care order. 1 Sealed Clerk's Papers (CP) at 12. In order to alter an initial shelter care order, the statutes governing shelter care require the court to find that there were changed circumstances. RCW 13.34.065(7)(a)(i) (requiring a showing of changed circumstances to alter the initial placement of a shelter care order). At the second shelter care hearing, the court found that there was no change of circumstances from the original shelter care hearing, meaning that nothing in the intervening period had changed the initial determination that an imminent threat of physical damage or harm existed. 1 CP at 3. I fail to see how the majority can fault the court for following the controlling shelter care statutes and, in so doing, unnecessarily add a requirement under WICWA that is not provided for in the language of RCW 13.38.140(2). It is sufficient that the superior court found there was imminent physical damage or harm at the initial hearing and that no changed circumstances altered that finding. I would conclude that the court complied with both ICWA and WICWA.

CONCLUSION

The statutory requirement that the government make active efforts to prevent the breakup of Native families is one of the central tenets of ICWA and WICWA. However, removal of a Native child is sometimes necessary to prevent imminent

22

*In re Dependency of J.M.W.*, No. 99481-1
(Stephens, J., dissenting)

physical harm, and ICWA and WICWA explicitly state that the statutes should not be construed to prevent removal on an emergency basis. Today's decision interprets WICWA to dramatically depart from ICWA, and it does so based largely on definitional differences without any express provisions mandating a judicial finding of active efforts prior to emergency removal. The result is an erroneous reading of WICWA that blurs the distinction between emergency removal and other child custody proceedings and that may lead to confusion in other contexts beyond this case. I would continue to recognize the alignment of WICWA and ICWA and hold that while active efforts are encouraged at every step in child welfare proceedings involving Native children, proof of active efforts is not required at a shelter care hearing. Because the superior court properly applied the relevant provisions of WICWA and made the appropriate findings to support the emergency removal of J.M.W. from his mother's home, I would affirm.

_____
Stephens, J.

_____
Johnson, J.

_____
Madsen, J.

_____
Owens, J.